The first case today, number 25-1169 and number 25-1170, Doe et al. v. and State of New Jersey et al. v. Donald J. Trump et al. At this time, would counsel to the appellants please introduce themselves on the record to begin. Good afternoon, Chief Judge Barron. I'm Eric McArthur for the government, and I would like to reserve three minutes for  You may. And just a word to the wise, I think the argument time is probably not going to accurately reflect how long questioning may go, so I just want everyone to be prepared for that. Go ahead. Thank you, and may it please the Court. The Citizenship Clause of the 14th Amendment, ratified in 1868 in the wake of the Civil War, rightly repudiated Dred Scott and extended citizenship to the children of the freed slaves and their children. It did not extend birthright citizenship as a matter of constitutional right to the children of aliens who are present in the country temporarily or unlawfully. On the contrary, the framers of the 14th Amendment included the jurisdictional clause to limit birthright citizenship to children born to parents who have a mutual relationship of allegiance and protection with the United States, such that they are fully subject to U.S. jurisdiction. Citizens and aliens who are domiciled here have that sort of relationship. Transient visitors and illegal aliens do not. As you know, independent of what your account of the original understanding of the amendment is, we have an opinion by the Supreme Court that we aren't free to disregard. So if you can address how what you just said matches up with Wong Kim Ark, and then we also have a statute in the INA defining citizenship, and how does what you're saying match up with that statute? Our position here is fully consistent with Wong Kim Ark. In fact, Wong Kim Ark more nearly adopts our position and our reading of the 14th Amendment than it does theirs. And the key pages of the Court's opinion in Wong Kim Ark are at pages 693 to 94. I think you need to think of the opinion in Wong Kim Ark in broadly two parts. It's a very long opinion, and everything before page 693 I put in the category of historical exposition. There's a very lengthy tracing of the law of citizenship, starting with the English common law, going through American antebellum law, then the Civil Rights Act, the 14th Amendment, the Court's earlier decision in Elk v. Wilkins in 1884, and then there is a key pivot point in the opinion. Right at the top of page 693.  So here's 693. The 14th Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance, and under the protection of the country. So the whole, what you called exposition, was about this ancient and fundamental rule of citizenship, which I understood to be just soli. That's what they told us in the prior 20 pages, and then they get to the key part, and they say, that's what we're adopting. I think you have to read on, Judge Aframe. If you read on on that page, even in the sentence that Your Honor was quoting, it says, including all children here born of resident aliens. Now on their understanding of the 14th Amendment, that language, of resident aliens, was completely unnecessary. The Court should have just said, including all children, other than the And the next part is, accepts qualifications of children of foreign sovereigns, born on public ships, or enemies of a hostile occupying territory, so, in that Indian tribe. So they set it out, they say, including these people, and then they give you the exceptions, and those exceptions don't apply in the circumstance we're talking about, so, it's the ancient just soli, and it's the exceptions. Well you have to, when you're talking about exceptions, you have to understand what the baseline rule is from which you are creating an exception, and here the point is, is that children born to non-domiciled aliens don't fall within the baseline rule to begin with. Did they fall within the baseline common law rule? In England, the children of temporary visitors did fall within the rule. Do you understand Wong Kim Ark to have adopted the English common law rule, or not to have adopted it? I understand Wong Kim Ark to have borrowed from the English common law the idea that a child has to be born within the allegiance and under the protection of the government, but to have modified the English just soli rule with a different conception of allegiance. Do you think it's a weird way to do something different when you say the 14th amendment affirms, first of all, do you agree the ancient and fundamental rule would be the common law rule? That's usually what we mean when we say the ancient law, right? I think they were referring to the common law rule when they talked about the ancient and fundamental rule. So what they tell us there is the 14th amendment affirms that rule, yes? That is correct. But the exceptions are the exceptions that the common law rule had, right? Except for the Indian tribes, which I think is different. Which is significant, yes. But not relevant to the point you're making now. Well, I still think we have not read far enough on page 693, because if you get past that first sentence, the next two sentences, and these are the key sentences of the opinion in which I take the court to announce the rule of law that it has discerned from all of its prior exposition of the law of citizenship. The court says, the amendment in clear words and in manifest intent includes the children born here within the territory of the United States of all other persons, other than the ones that had been recognized as exempt previously, of whatever race or color domiciled within the United States, not present within the United States, domiciled within the United States. And the next sentence says, every citizen or subject of another country, while domiciled here, not while present here, while domiciled here is within the allegiance and the protection and consequently subject to the jurisdiction of the United States. Let me give you the definition of domicile. I understood that to mean a person with an intent to stay here. Is that sort of a, how would you define it, domiciled? Well, domicile comes in different varieties. Domicile by choice was typically understood to be you've established a residence, a home with the intent to remain, but I think that rule was always against the background that you had established a residence in a place where you were lawfully permitted to be. But if it means I've set up a residence with an intent to retain, that's like a fact specific analysis. If this was the understanding of the 14th Amendment at any point, did that ever happen where the government sort of started to analyze, because right, I understand this all happened before we had this idea of sort of illegal immigration. Is that right? Well, it depends on what you're talking about. The 14th Amendment was before there was a concept of illegal immigration. Waldenmark was not. So if domicile was the thing, then you would expect there would have been some kind of method to litigate or evaluate this complicated question of, are you here temporarily? Are you here indefinitely? What's your situation? Did that ever happen anywhere? That absolutely happened. And in fact, the history of the implementation of the 14th Amendment in the first 30 to 40 years after it was ratified in 1868 is fully consistent with our view. There was, for example, twice in the mid-1880s by two separate secretaries of state, a determination made that a U.S.-born child of aliens who were not domiciled in the United States was not a natural-born citizen within the meaning of the 14th Amendment. Those cases raise an expatriation issue, which is not the same as the issue present here. And in fact, Waldenmark ends by discussing expatriation and talks about perhaps something could happen during the minority of the child that would lead him no longer to be a citizen, but we're doubtful that's true. In any event, we don't have to decide that precisely because everybody's domiciled. That's a distinct question of whether birthright citizenship includes persons who are children of persons who are not themselves domiciled in the United States. Chief Judge Barron, I disagree with that characterization of those two 1885 passports. Waldenmark itself talks about expatriation in just those terms at the end of the opinion and explains why it doesn't have to deal with the expatriation issue in this case precisely because of the domiciled nature of the parties to it and distinguishes that question from the question of whether the person is a citizen under the birthright citizenship clause at the time of birth. And it's that second point that you're disputing is correct, right? I was answering the question of whether it was ever implemented that you were looking at the domicile of the parent to determine whether a U.S.-born child was a citizen, and that was the case. Those two 1885 passport denials did not say they were born citizens and then expatriated when they left the country. They both say expressly that the child was not born a citizen because the child was subject to a foreign power and not subject to the jurisdiction of the U.S. I think a more fundamental problem that I'm having with your argument is that the position that you are presenting to us is actually the position that the dissent took in the case. So the dissenting opinion would have said that people who were here on a temporary basis should not, even if the child was born here, if the parents were only here on a temporary basis, they should not be considered citizens. And of course, we have to apply the majority opinion, not the dissenting opinion. So I can point to other parts of the case where I think it's quite clear what the court held. You're pointing to language. I absolutely agree with you. You've read what's in the words on the page, but it's quite clear what the dissent's position was and what the majority position was. And so aren't you really asking us to adopt the view of the dissent, which is something we can't do, right? No, we're definitely not asking you to adopt the position of the dissent, Judge Rickleman, and I do think it's important to understand what precisely was the point of disagreement between the majority and the dissent in Wonky Mark. It was not over the question of whether temporarily resident people's children were citizens. The specific point of dispute was not whether domicile is necessary. It was whether domicile is sufficient, even in the face of a statute saying that persons of a given nationality could not naturalize. Didn't the dissent treat the majority as having adopted the English common law rule, which was precisely the point that the dissent objected to? I think the dissent did understand that some version of the English common law rule... Where did you get the idea of some version? It says the whole problem is you're adopting the English common law rule. Here's where I get the idea of some version, which is both the majority and the dissent understood very well that under the English common law, a temporary resident who had a child in Great Britain, that child was a natural born subject. The majority goes on to say that that English common law rule was in place in all of the colonies and continued up until the date of this opinion. If that is the majority's view of the law, then it is inexplicable why they included those domicile limitations. Why wouldn't that be relevant to the expatriation question? I'm not sure I follow why that would be relevant to the expatriation question. Well, I thought that the whole idea was whether, as the majority in Longtenmark put it, did something happen during the minority of the child that could potentially have changed whether he could now claim citizenship? And the answer is no, because they've been there the whole time. We're doubtful it ever could. But why isn't it directly relevant to that point? That was a point of contention in the case. I'm not sure I follow. I mean, the parents in Longtenmark were not citizens, so they couldn't expatriate. But of the child. But there were cases where if the parents who were alien citizens had a child born in the United States, immediately left with the child, never to return for 30 years, then that person now claims citizenship. Can they, even if they had birthright citizenship? That was evident in the debates in Congress in the 1940 Act and the 50 Act was what do we do about that? And they kept saying that's an expatriation issue that has nothing to do with whether you're a citizen when born. But that seems to be completely consistent with how Longtenmark was understanding it. The sentence that I read to you that I take to be the rule of law, the court announced is not talking about the domicile of the child. It's talking about the domicile of the parent. Counsel, why isn't the rule of law that the court adopted? Because what the court was doing was trying to understand the key language about jurisdiction. And what the court says on page 682, it says quite clearly the real object of the 14th Amendment, in using the words and subject to the jurisdiction thereof, would appear to have been to exclude by the fewest and fittest words, the two classes of cases, children born of alien enemies and children of diplomats, both of which has already been shown by the law of England and by our own law, have been recognized exceptions to the fundamental rule of citizenship. And that's what it says. It says those are the two exceptions. Why is that not the clear holding of the case? Because it doesn't tell you on page 286 what they are excluded from. That's what they do tell you on page 693, where they say something very similar. And I don't understand what you mean, what they're excluded from. This language that I just quoted is interpreting the text of the 14th Amendment. That is that issue in this case. And it's saying that what that phrase means is that it's excluding just two classes of people. They're just talking about an exclusion. You need to understand what's the rule and what's the exception. Well, the rule is that everybody who's born here is a citizen. That's not what they say on page 693. On page 693, they articulate the rule in terms of all children here born of resident aliens. But that's not what the text of the 14th Amendment says. Well, the text of the 14th Amendment talks about subject to the jurisdiction of the United States. OK, and Fred, and that's the text that I just quoted for you is is the part of the opinion that's very explicitly interpreting that key phrase. Just one question I'm not fully understanding. Let's say you're right. And Wong Kim Ark meant to make domicile necessary to the holding. Where, in the opinion, does it give an explanation, given all it otherwise said that that was necessary to the whole? I don't know that they ever explained that. So Justice Gray decides to spend every waking hour that you can find going through the entire history of everything. Lays it out, paragraph, paragraph, case application, the point you almost feel like I get the point. And you say, actually, he missed the point, because what he was really trying to show is there's this other thing domicile that's required. I just don't want to talk about it. That's a very odd way to read. I ultimately can't tell you why they wrote what they wrote. I can certainly tell you three that you really like. He's talking about Lord Coke and Calvin's case, which is the premise for the just so I rule. Right. And we're not saying there's not birthright citizenship. There is birthright citizenship. You're saying it's not the common law understanding of birthright. I think we have a modified American American version of you solely where we have a different concept of allegiance. But I move you to the British for a second to the and your take is that the dissent understood the majority to have done that or that the dissent misunderstood the majority. I don't think the dissent misunderstood the majority. But I think as often as the dissent understand the majority to adopt only the modified common law rule or the actual common law rule, which do you think the dissent understood the majority to do? I'm not certain about that. But as is often the case, when there's a dissent and the majority, they may agree on many things. And so you have to be focused on what is the point of disagreement. It may well be that the majority drafted the opinion, read the dissent from Chief Justice Fuller, where he talked about that. We have a different view in America of temporary sojourners. And the court said, you know what, that's not an issue in this case. The parents who were domiciled, they weren't temporary sojourners. We either agree with the dissent on that point or don't mean to decide that in that in this case. And that may be the origin of these limitations in the court's holding. I don't know. I can only speculate about that. Counsel, I guess another question I have for you then in trying to understand the decision is how it could have come out the way that it came out if we were to accept your argument. So, for instance, you have these two additional rules. One is domicile and one is allegiance, sort of based on a modern understanding of allegiance. But if we were to adopt your understanding of allegiance, how could this decision have come out the same way? Because Wonky Mark's parents were not citizens. They were, in fact, unable to be citizens because of the exclusion acts that were in force. So they had been legally stripped of the ability ever to become citizens. They then left and went back to China and remained in China as he went back and forth between the two countries. So in what way would they have been viewed to have allegiance to the United States in the way that you are using that term today? It seems impossible under the facts of this case. So I don't see how the case could have come out as it did if we were to adopt your understanding. I disagree with that strongly, Judge Rickman. The case would come out exactly the same way under our rule. In fact, I would be perfectly happy. I couldn't state it better myself. Those two sentences that I read to you that state the court's rule of law, that is our rule of law. Our point is, how would his parents have had allegiance to the United States in the way that you're interpreting that term when they were legally excluded from ever being citizens? In other words, the law of the country at the time discriminated against them because they were Chinese. Our point is that for aliens becoming domiciled here creates the requisite relationship of allegiance and protection to bring them within the complete political jurisdiction of the United States, which is what the phrase subject to the jurisdiction in the 14th Amendment means. So you don't have to set the additional requirements. You have just one is what you're saying. Domiciled is what brings an alien within the complete political jurisdiction and creates that requisite relationship. Children of domiciled people are the ones with allegiance? Well, we're talking about the category of aliens. It may be different for other categories of people. For example, citizens. I don't think there's a domicile test for citizens. But what you're asking is an alien. Someone who's born abroad comes from abroad. Obviously, when they're living abroad, they are not subject to U.S. jurisdiction in any respect. They owe no allegiance to the United States. The question is, what sort of act on their part brings them within U.S. jurisdiction? Isn't that the point of the quotations from the Schooner Exchange in the opinion? That what brings them in is presence because they then have a temporary local allegiance, which means they're then within the legions, in the old language, the legions of the king. That was not the pledge of allegiance. The legions of the king, like my liege. Right. And then what's excluded from that? Well, a couple of things are if there's an immunity from the king's jurisdiction over those people, such as when there's an invading army or if it's a foreign diplomat, then you're not within the legions of the king, even though you're born within the territory, the physical territory. That was the coherent common law rule. So there's a key point here, Chief Judge Barron, which is that in the 19th century, it was well understood that jurisdiction and its counterpart allegiance came in degrees. OK, jurisdiction is the authority to regulate allegiance. We think of as the duty of obedience. Those things came in degrees. And what the Schooner Exchange was talking about is there is this lesser form of allegiance of an alien who comes from abroad. It happens to be the thing that is the oddity of your position, but I don't quite know if I have an answer to it. The thing you're saying is irrelevant is the thing Justice Gray quoted and the thing you're saying matters. He didn't mention. So I'm a little bit puzzled. He did say the word domicile, but he gives no rationale or explanation of why that matters. He does give an explanation of why the temporary local allegiance the Schooner Exchange is talking about does matter to what to what qualifies as subject to the jurisdiction. And in the same breath, when he's talking about the Schooner Exchange, he also talks about the nation's early naturalization laws under which aliens who were residing in the United States were deemed to be under U.S. jurisdiction. That was the language of the naturalization laws under U.S. Can I move you, unless my colleagues have further questions on Wong Kim Ark? Yeah, go ahead. I understand. I know political jurisdiction is the one that you says matters. And I just want to understand the definition of that term. So I understand regulatory jurisdiction. If you think traditional just so lies the rule, that's what you think about. But you say it's this political jurisdiction. What is that? Well, first of all, it's not just that I say it's the test applied by the court in both Elk and Wong Kim Ark, subject to the complete political jurisdiction. And this goes to the point that I was making that jurisdiction. But at one point you just said a key word. I think you said complete. That's different than exclusive. It is different than exclusive. I agree with that. You seem to be arguing for something like exclusive rather than complete. No, our position is exactly what the court in Wong Kim Ark said, which is that an alien who is domiciled here has sufficient allegiance to the United States. Even a person who doesn't have domicile is still under the jurisdiction in the same way that we'd be talking about civil jurisdiction might be different. But that's the whole distinction that Wong Kim Ark itself makes between those two things, that the political jurisdiction is the subject of the jurisdiction of which is legions within the legions of the sovereign. My understanding of what the Supreme Court meant by political jurisdiction is, I think, encapsulated well by what Senator Jacob Howard said. He was a sponsor of the 14th Amendment. And during the debate about whether Native Americans would be viewed as subject to the jurisdiction of the United States. And this was a key debate to understand what that language means, because they all agreed that they were not making citizens out of the children of Native Americans. And the whole debate was about whether the jurisdictional clause, the language that they had chosen, was sufficient to that end. And in explaining why it was, why Native Americans were not subject to U.S. jurisdiction within the Union of the Clause despite Congress's plenary authority over them. This is what he said. He said, the word jurisdiction, as here employed, ought to be construed so as to imply a full and complete jurisdiction on the part of the United States. That is to say the same jurisdiction in extent and quality as applies to every citizen of the United States now. That is what the majority Justice Gray, same author for Elk and Wong Kim Ark, then picks up in Elk when... How does that help your position? I thought that is the position of your opponent. The complete jurisdiction was what was required. And those entities who are on the territory of the United States, nonetheless have an immunity from that jurisdiction, even in part, fall outside of the subject of the jurisdiction. Our point is that someone who is here temporarily or unlawfully doesn't come within the complete political jurisdiction of the United States simply because they have a duty to obey U.S. law while they are here. Complete political jurisdiction means something more. This is what the court said in Elk. The evident meaning of the jurisdictional clause is not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction and owing them direct and immediate allegiance. So when we're talking about political jurisdiction, Judge Aframe, we're talking about the most complete form of jurisdiction that a nation can have over a person. The kind of jurisdiction where you not only have a duty to obey the law while you are present in the territory of that country, but the kind that gets you convicted of treason if you leave the country and take up arms against the United States abroad. Or the kind where the United States, if you are abroad and you are in trouble, will extend its diplomatic protection on your behalf. We don't do that to American-born children born in the United States. We don't do that to aliens who are temporarily or unlawfully present here. And that is why they are not within the complete political jurisdiction of the United States. And why don't, what's the evidence, or just give me a scenario where we don't do that. You know, I would think we would do that. Would someone born in the United States who then travels somewhere and something terrible happens to them in another country, we don't come to that person's aid? No, I think the disconnect here is I'm talking about the parent and you're talking about the child. Right, and that's my, I guess my fundamental question in this whole thing. Why are we talking about the parent when we have a provision that's about the child? Because that was the common law rule. The common law rule, and the exceptions to it, was always about the relationship of the parent to the sovereign. Well, unless my colleagues have further questions, I'm welcome, Mark. There's also a statute. Indeed. The statute, first 1940, then 1950, as I understand, 52, as I understand the history, President Roosevelt puts together a group of learned people to advise on what to do and, with respect to defining citizenship. Unless you know something I missed, it seems like that committee couldn't have been clearer in its view that Wong Kim Ark adopted the old common law rule, not as modified. The history then indicates that Congress, in ratifying or in enacting it, both times seem to issue reports and have statements and testimony that all seems consistent with that understanding of that expert committee about what Wong Kim Ark established. Is there some reason why that shouldn't govern our understanding of those statutes, which I take it you acknowledge you have to follow? Of course. We acknowledge that we have to follow the statute. Yes, I think there is a reason why that doesn't control the interpretation of the statute. I do agree with the first part of the question, Chief Judge Barrett. It's pretty clear that the Roosevelt administration read Wong Kim Ark to mean that domicile wasn't required. Just explain even that piece. We just were trying to figure out what did Wong Kim Ark mean. Why did they get it so wrong? They seem like pretty bright people. They're closer to it than we were. They're not just thinking up. They're charged with, can you tell us what Wong Kim Ark means the president would like to know? How did they get that wrong? The first point I would make is that the Roosevelt administration's interpretation of Wong Kim Ark differed from the earlier executive branch interpretation of Wong Kim Ark. What do you mean by that? Is that just that one assistant attorney who wrote some things in an appendix? It's not just that person who was not just an assistant attorney. He was the assistant attorney general. That's a big difference. He created an appendix to a report that was about a different topic. Is that what you mean by the executive branch, sort of definitive executive branch interpretation? That's one instance of the executive branch interpreting Wong Kim Ark the same way we do. What else do you have? I think the most potent one is that for the first decade after Wong Kim Ark, the State Department administered the Chinese exclusion laws with a domicile requirement. What do you mean by that? Chinese people who were born in the country were exempt from the Chinese exclusion acts only if they had been born to parents who were domiciled here. But that's interpreting a statute, not the 14th Amendment. So why does that bear on how people understood the interpretation of the 14th Amendment? That was the executive branch's understanding of the 14th Amendment as construed by Wong Kim Ark. The relevant original public meaning or the way people understood things that we care about is 1940 and 1952, correct? Right. As we come to 1940, is there some reason to think as we're heading into that that the understanding of the citizenship clause was other than the expert committee of the President of the United States plus the expressed views of the members of Congress in deciding whether to pass that legislation? I'm not sure what you're talking about with the plus, but let's just first focus on the... The testimony where there's a back and forth and they're asking the administration witness, what about all these people that live abroad, that were here for five seconds, had a child, never went back to America, are they citizens? He says, yes. They say, maybe that's about expatriation. He says, you're not saying that they're not citizens though, right? He says, that would be absurd. Of course we're not. The Constitution requires it. I don't know who said it was absurd, but some of the colloquies I have read, it sure seems to me that the members of Congress who are listening to the executive branch testify about their view of Wong Kim Ark are very skeptical. They're very... I don't know that I've come across anything, nor do you cite anything, indicating they're skeptical that's the constitutional rule. They're skeptical about whether with respect to repatriation, there should be a different rule. But I haven't seen a single thing suggesting that the rule should be otherwise. If there is something, I didn't see it in their briefs. I think we did cite it in our reply brief in the second case today, where a member of Congress asks the executive branch representative, well, is there anything in this legislation that would change that? And also expresses a view that, well, we can't really change what the 14th Amendment does anyway, so that's sort of out of our hands. How has that helped you? That's indicating that their view was you couldn't change it. No, I don't think... Well, I think... You certainly desired to change it, but that's not... I think that view would be consistent with the position of what they're doing in Section 1401 is codifying the 14th Amendment. And it just means what it means. And what it means is beyond the power of Congress to change, but what they are intending to do is to import the 14th Amendment. What matters is their understanding of what it meant, not what it actually means. Correct? No, I disagree with that. Really? I do disagree with that. If they think, if I'm passing a law and I think Wong Kim Ark means X, and I vote for that law and that understanding, doesn't that law then mean what I think Wong Kim Ark means, not what it actually means? That's what the law means, because that's what I thought I, being the legislature, thought it meant, or the broader public at the time. I don't think that's correct in this scenario, because what the language does is it is drawn word for word from the 14th Amendment. It's like, for example, when a regulation parrots a statute. I think the inference in that situation, when you are codifying word for word a constitutional amendment into a statute for the exact same purpose, the inference, to my mind, is irresistible. Is this your view, just so I understand it? At the time, 1940, when they passed the statute, let's say Wong Kim Ark means the opposite of what you are saying, and it means what your opponents say it means. At that time, when they enacted it in 1940, and they all say, we're doing what Wong Kim Ark means, I would think we would interpret the statute to accord with the old common law rule, not with standing your view that everybody got it wrong in Wong Kim Ark. Correct? Just follow me on this. Correct? No, I disagree with that. So even then, despite what they did in their statute, is there any precedent for any statute ever being so construed? If the Supreme Court strikes down Wong Kim Ark and says, that's not right, it's this, something else, your view, domicile, let's just say that's how it eventually played out, does that mean the meaning of 1401 changes because the Supreme Court has now issued a new opinion about the 14th Amendment's birthright citizenship? I wouldn't say the meaning, but I would say the correct interpretation does, yes, I think in that sort of situation. How is that possible? That seems contrary to Supreme Court case law, which is very clear that we have to interpret a statute based on the understanding of its words at the time that it was enacted. I don't think, and this is to your point, Chief Judge Barron, that the Supreme Court has confronted a situation like this one, where you're codifying a constitutional amendment to… Title VI, Title VII, I mean, Title VI is that. Let me try it this way, Chief Judge Barron, let me give you an example, okay? You think Title VI means what Bakke means? I haven't studied the Title VI issue, but let us suppose that Congress decided it was going to enact a statute that was a comprehensive code of all of the privileges and immunities of citizens of the United States, both constitutional and those granted by statute, and the first thing that it did in that statute was drop in the Bill of Rights. I think in that situation, that statute should be read to mean whatever the Bill of Rights mean as construed by the Supreme Court. That is exactly what they did here. If you look at the 1940 statute… What's the point of the statute, then, counsel? That's just what I was getting to, Justice Clement. If you look at the public law in 1940, the caption of the act is about creating a comprehensive nationality code. That is what they wanted to do. They wanted to have one place in the code where you could go and have it be comprehensive about who was a citizen, and the first thing they did is they copied the constitutional baseline from the Fourteenth Amendment, and in that sort of situation, I think the right way to construe the statute is in parallel with the Supreme Court's interpretation of the Fourteenth Amendment. Do you have any precedent or case file that supports that interpretive approach? Because I'm not familiar with it. I'm not aware of a case that poses that issue, but let me just try another example from an adjacent context. So it's a novel interpretation. I think it is novel. Let's suppose, for example, that at some point between Plessy v. Ferguson and Brown v. Board of Education, Congress had enacted a statute that said the District of Columbia shall not deny equal protection of the law to its residents, and suppose the legislative history was that what we're trying to do here is subject the District of Columbia to the same equal protection standard that states are subject to under the Fourteenth Amendment. If that provision came up for interpretation today, notwithstanding that it was enacted against the backdrop of Plessy v. Ferguson, I think the right answer would be that statute prohibits school segregation. We just omitted all of the legislative history that we were just discussing, which is that rather than saying what they want to do is just tie it to whatever a subsequent court decides the statute means, they specifically were saying what we are adopting is the understanding of the Constitution that was the old common law rule as they understood it to be the law of the land after Wong Kim Ark. In that situation, why would we say the statute meant something different? What they said they were doing is enacting a provision that accords with the Fourteenth Amendment. They said more than that. They did. They just acknowledged. They, in our view, had a mistaken understanding of the Fourteenth Amendment. That's to be disregarded by us today. I think that does not control the correct interpretation of Section 1401 today, but I don't think you have to agree with me on that point to reject their legislative ratification argument. Even if you disagree with me that the statute should be construed in harmony with the Supreme Court's interpretation of the Fourteenth Amendment, I don't think the requirements, just the standard requirements of legislative ratification are met here. As this Court has said, for that canon to apply, you have to have a broad and unquestioned consensus. Here there was definitely an executive branch view at the time, but that had been one that had shifted over time. There's not a single case. And what do you make of the private bills from Congress treating persons of just the kind that your executive order would treat as not citizens as citizens? I'm not sure that I've seen any of those private bills. There's a whole list of those cases where you have two parents who were born outside, and the child's born here, and they have a private bill or an executive action. We're not going to deport those parents because this child is a citizen, even though your theory would not be a citizen. There's a whole list of them. The one pre-1940 instance that I can recall reading about was a situation where I think it was not clear that the parents were in the country unlawfully, and so it's very possible that the Congress— I'm referring to the Immigration Scholars Brief that had a whole series of those. And I think some of that series postdated 1940. I could be mistaken about that. There are a lot of briefs in that case. But if they were between 1940 and 1952, that would matter, right? Because this happens again. I don't think so. I think 1940 would be the relevant time for the ratification canon. 1952 was just a recodification without any— Is there any case between Wong Kim Ark and 1940 or 1952 that adopts your understanding of allegiance and domicile? Can you point to any case? I don't think there's any case between Wong Kim Ark and 1940 that addresses the status of non-domiciled aliens either way. In fact, I think there's only one case in the history of the Republic that squarely addresses the status of— What about temporary? Pardon? What about just not the unlawful persons, but just people here who are temporarily here? Right. Even if you're just talking about temporarily resident, and that's the reason they're not domiciled, I'm aware of only one case in the history of the Republic that confronts that fact pattern and decides the question. That's Lynch v. Clark. And where was it cited most favorably? In Wong Kim Ark. It was cited in Wong Kim Ark, but at the same time, Wong Kim Ark also cited the New Jersey Supreme Court's decision in 1895 in Benny v. O'Brien, which had said that domicile was required. My fellow panel members have further questions on the merits. There's obviously standing issues that I'm sure you would like to address. I would. And so, separate and apart from the merits, that is an independent reason why the injunction that was granted to the state plaintiffs should be vacated, because the states lack standing twice over. They lack both Article III standing, and they lack standing to assert the individual citizenship rights of their residents. I want to start with that latter point about the separate bar, because this is over and above Article III. It's well established that even if the plaintiff has an Article III injury, if what they are doing is saying they are injured in some way downstream of the violation of a third party's rights, they don't have standing to bring that claim because they are not asserting their own rights. So why don't they fall into the very clear line of Supreme Court case law that says, if the law is being enforced against you, you can't actually then raise the rights of a third party that's implicated, that's affected by the law being enforced directly against you. So the first point I would make on that, Judge Rickleman, is the states did not even make that argument in the district court, and so I think that argument is forfeited, and I don't know why we would consider it. I guess I don't totally follow. Did you raise that aspect of Kowalski when you were doing the third party standing argument? We raised the third party standing argument, and they came back and said we are not asserting the rights of third parties. They didn't say we fall within exception. I don't think we have an obligation to preemptively refute the applicability of an exception that they didn't themselves invoke in the district court. Set that aside. I do think they forfeited the argument. I also don't think they fall within the exception. The exception applies when the enforcement of the challenged action against the plaintiff indirectly leads to the violation of the third party's rights. They don't satisfy any part of that. First, as to the first part, the challenged action here is the executive order, and it is not enforced against the states in any way. It imposes no duties or obligations on the states whatsoever. And we can't extend the challenge to be to the implementation of the order. No, I don't think so. The order was the only thing that they challenged. There wasn't any implementation. The injunction runs against the implementation of the order. But there was no implementation of the order at the time. That's what they didn't want to have happen. They didn't want it to be implemented. But what they were stopping was the implementation, I thought. But the challenged action is the order. Why do you keep saying that? I thought the injunctions against the implementation, can't we understand them to be challenging the implementation or not? I don't think so. I think the challenged action here that they're trying to get enjoined is the executive order. The injunction literally, what it does is prohibit the defendants from implementing the order. That's where all the harms would flow from. So I'm confused by that as well. And it may be that administrative agencies downstream of the order have to take steps. But that still doesn't mean that the executive order is being enforced against the states. When you say against the states, I don't know what that means. So Section 2 of it says the United States will not accept certain documents issued by the state. But I can rewrite that sentence and say the state shall not be allowed to issue certain documents. That is a hugely material difference. I don't think the president has authority to issue an executive order that tells the states what sorts of documents. So states want to submit them, and now the government says we won't take them. That doesn't affect the states? I mean it may affect them. It does not regulate them in any way. They have no duties. All of the Supreme Court's cases. Where did you get the idea of a duty with respect to enforcement? All of the Supreme Court's cases, applying this exception, are situations where there is a legal duty imposed on the plaintiffs. And the plaintiffs are effectively coerced by that legal duty to do something that violates the third person's rights. We don't have that situation here, and we don't even have, the states haven't even pointed to any document. What about triplet? Pardon? What about triplet? You'll have to remind me of that case, Chief Judge Barry. I thought in triplet, the attorney under the Black Lung Act wanted to get fees that were of a certain amount. A regulation was passed saying you can't get fees of that amount. He claimed it was a due process violation because it interfered with his ability to contract with the client he would otherwise work with. And Justice Scalia says that's fine. That falls within the exception for third party standing. And in Kowalski, they identified triplet as a case that falls within the line of cases that you just said were cases that only are cases that impose duties. I'll have to look back both at Kowalski and triplet to see if that was applying the close relationship hindrance. It was not. There's two different lines of cases. One is when it's enforced against the plaintiff. One is when it is not. Triplet is in the first line, and Kowalski is very clear about that. Okay. I will have to go back and look at triplet. But even if the executive order were enforced here against the states, which I don't think that it is, there's not a situation where that enforcement is indirectly leading to a violation of any third person's rights. Okay. I mean, I think if I understand the argument that they're making on the other side is that the federal government may no longer accept certain documents that are issued by the states, which they haven't pointed to any such documents that the federal government is refusing to accept, and that, as a result, the federal government isn't … All the documents they have to submit in order to show eligibility for the people in the programs that they've pled? I don't think they've identified a document that the federal government will refuse to accept. The federal government is not going to say we're no longer accepting your birth certificates. They may say the birth certificate is no longer sufficient proof of citizenship, but they haven't said we're not going to accept the birth certificate. But even if you get past that, there's not a situation where that is leading to the violation of any individual rights because the whole premise here of the state's Article III argument is that they are providing these services to the individuals regardless of whether they qualify for the federal program, regardless of anyone's immigration status or citizenship. So the individuals are going to be getting these services from these states regardless. All that's left is a dispute over who pays the tab. The states or the federal government. That's not a situation where anyone's individual rights are being violated. So if the states change their position, that would change it if the states said, sorry, we're just going to let the people fend for themselves now because we don't get the federal… I think it might be a different analysis in a state that limits the services to those who qualify under the federal program. None of these states do. That's JA 212 paragraph 126. So I do think that the bar on asserting the rights of a third party is enough by itself to conclude that the states are not proper plaintiffs here. I also think they have an Article III problem because none of the injuries that they've alleged are fairly traceable to the executive order. They all depend ultimately on implementation decisions that are being made by federal agencies downstream of the executive order. The executive order doesn't say anything about eligibility for benefits. It doesn't say anything about who does or does not get a social security number. All of that's downstream of the order. Can I just go back a step on the denial of a third party right? Sure. Do the persons claiming citizenship, the individual persons who would like to claim citizenship that the order would treat as noncitizens, do they have a right to the federally funded program? I don't think so. I don't think so, Chief Judge Barron. So even if the statute required them to be eligible for the federally funded program, you could deny it to them, and the answer would be don't worry about it. You'll get it for a non-federally funded program? No. I think if it's an individual, these would be the federal government. Isn't that the third party right that's being lost, the right to the federally funded program? I don't think so in the case where they are receiving the service. If that's the case, then what you must be saying is they don't have a right to the federally funded program. I think if they have received the service. What's the service? Federal service or not the service? Well, I got health care somehow. Maybe a doctor donated it to me, so forget it. But what they're saying is no, I'm entitled to this federal program participation. That's what I've lost. I went out and I was lucky enough to find a doctor who would help me. Thank goodness. But I still lost my right to the federally funded program. But it's not just that the doctor helped that person. It's that the state picked up the tab. And so I think what you're asking is does the individual have an individual right to have the federal government reimburse the state for that service? And that seems wrong to me. No, just to be treated as eligible for the program. Yes, I think the individual has a right to be treated as eligible. And they'll lose that right under this order. I mean, if they don't fall within a qualifying immigration status, they may. And that's the third-party right that would be lost to enforcement of the order against the person whom it's enforced against, if it's fair to treat it as being enforced against the state. That right is lost when the federal government enforces the EO against the individual. There is no enforcement against the state, and I fail to see how any such enforcement against the state is causing that violation. That runs from the federal government to the individual. One of the ways the individuals get eligible for the program is through the state submissions? None of which the federal government has said they are rejecting. Okay. But then there's no problem. But assuming that the order is going to reject some of them. I think the agencies implementing the order may require more information from the state. And not count certain things. But I don't take it that they are rejecting any of the state documents. Isn't that exactly what the order says? I'm just confused by your argument, counsel. The EO says that it's the policy of the U.S. that no department or agency shall accept documents issued by state, local, or other governments or authorities reporting to recognize United States citizenship to the persons covered by the order. That is what the EO says. My point is they haven't pointed to any such document that they are tendering to the federal government and the federal government is rejecting. But how could they? It's been enjoined. I don't... That they will point at the law? Or that they would tender. They haven't pointed to any such document. Well, those have to submit documents to Medicaid that show these are eligible people. One piece of eligibility is citizenship. Doesn't that somehow have to get communicated? It does get communicated. My point is they haven't identified any document that the federal government will reject. Let's suppose that they submit a birth certificate. The federal government hasn't said we're rejecting your birth certificate. Okay. Independent of the two standing bars, I also think the injunction should be vacated because they haven't established any irreparable harm. So the harms they are pointing to are by and large monetary harms which are classically reparable harms. And as we pointed out in our opening brief, they have never in this litigation explained why they won't be able to get any denied reimbursements down the road. They said nothing about that in their red brief. This is on the assumption that they can't assert the rights of the individuals, correct? No, I don't think this argument has to do with the assertion of the rights of individuals. You don't think any of the individuals who'd be denied citizenship under the order have irreparable harm? Oh, sorry, I missed something. We're not disputing the irreparable harm of the individuals. This is an argument about the states and whether they carry the burden. And that's assuming that they can't raise the rights of the individuals. Even assuming they can raise the rights, I'm not sure they can get an injunction based on irreparable harm to the individuals. I think an injunction running to the states would have to be based on irreparable harm to the states. And certainly I think that must be the case after CASA. But they haven't established irreparable harm. They haven't shown that they will be unable to recover any wrongfully denied reimbursements down the road. That by itself should be enough to reject their argument that they're going to suffer irreparable financial harm if the executive order is implemented. Can I just ask you one question? If we thought there was, I think they have a burden of showing irreparable harm, but if they do, then we balance the equities. And do you have an equity on the other side against the enforcement of this injunction? Sure. We have the equity of enforcing an executive branch policy. How does that comport with the failure to appeal the existing preliminary injunction in the New Hampshire case? You're talking about in the Barber case? I think we're well within our time period to appeal that. The appeal hasn't expired? In Barber, the newly certified class action? Oh, no, that has not expired. And I don't speak for the Solicitor General, but I'm quite confident that we will be appealing that. Anything further? Thank you. Thank you. Thank you, counsel. At this time, would counsel for the Appalachian States of New Jersey at all please introduce himself on the record? Good afternoon. Shankar Duraswamy from the state of New Jersey for the Appalachians in case number 1170. I will plan to start with the two issues that were not squarely addressed by this court in its ruling on the stay motion. The merits, where the government's position is directly contrary to a 127-year-old Supreme Court precedent, several subsequent Supreme Court decisions, over a century of executive branch practice, and an 85-year-old congressional statute. And the nationwide scope of the injunction, which the district court has now reaffirmed based on an undisputed record showing that no narrower injunction could workably redress plaintiff's injuries. Finally, I have a few points, responsive points, that I'd like to make on the standing issues. Turning first to the merits, Wong Kim Ark conclusively resolves this case and squarely refutes defendant's domicile theory. I don't want to belabor this point because I know there was already some extended colloquy about it. But critically, the court in Wong Kim Ark explicitly recognized that under the English common law rule, birthright citizenship extended to the children of foreign parents whether the parents were settled or merely temporarily sojourning through the country. It also added in its discussion of the English common law rule that the question of naturalization and of allegiance is distinct from that of domicile. Counsel concedes this point, as defendants do, in their reply brief at page 12, and that concession is fatal because Wong Kim Ark goes on to say that the English common law rule was in full force and quote-unquote continued to prevail in the United States. And it goes on to hold that the phrase subject to the jurisdiction in the citizenship clause was intended to capture only those exceptions recognized under the English common law rule with the single additional exception of children born to Indian tribal members. How do you explain the references to domicile at the end? Sure, so I think given the facts of this case, given the expatriation issue that Your Honor identified in the previous colloquy, and given the fact that the court had already articulated the holding of the case, had articulated its understanding of the phrase subject to the jurisdiction, which is the passage that Judge Rickleman referenced, and then made extremely clear at the beginning of the paragraph that counsel referenced that the 14th Amendment affirms the fundamental and ancient rule of birthright citizenship with the single additional exception of children born to Indian tribal members. It was sensible and natural for the court to then turn to applying that holding to the circumstances that were immediately before it. I think it's also important to note that the sentence says the amendment, so that's the 14th Amendment, in clear words and in manifest intent includes the children born in the territory of the United States... domiciled within the United States. So they're telling me what the amendment says, and they are adding domicile within the United States. Why? Again, I think that is not meant to constrain the scope of the 14th Amendment or the Citizenship Clause. I think it's abundantly clear from the passage right before it that the court has conclusively and exclusively defined the scope of the exceptions relative to the English common law rule that was adopted, and I think you have to look at the sentence that comes right after the two sentences that counsel wants you to focus on in which the court says, an alien is completely subject to the political jurisdiction of the country in which he resides independently of intention to continue such residence, independently of any domiciliation, independently of the taking of any oath of allegiance because he owes obedience to the laws of the government. So the key word in the passage, Judge Ephraim read, is includes? That's right. I think it's acknowledging that it includes children of domiciliaries, which, again, is a sensible and natural thing to do given the facts of the case that had been described at the outset of the opinion. But it in no way undoes the previous two passages in which the court definitively said that the object of the phrase subject to the jurisdiction was to adopt the two long-standing English common law exceptions with the single additional exception of the children born in these various... But Judge Ephraim just litters it with domicile because, in fact, he had a case before him that's about people who were domiciled here. That's the extent of its importance. So I don't actually think if you read the totality of the opinion that it's littered with... At the end, though, when it was a long story, no doubt, the whole history, but then you're right, you do get to the end, and it's there a lot. And I'm just wondering, is that just because those are the facts of the case? I think they're really just these two references that are sandwiched between the holding, which does not leave room for any exception for the children of non-domiciliaries, and the statement that makes abundantly clear that one is completely subject to the jurisdiction independently of domiciliation. So I do think it is, again, a sensible and natural reading of the opinion that the court would then turn from having articulated the holding in its definitive explanation as to the scope of the citizenship clause to explaining how it applies to the facts before it. Just help me with this expatriation point. What do you understand Wong Kim Ark to be saying when it gets into the issue of expatriation? Well, I think consistent with what Your Honor identified earlier, I think what Wong Kim Ark is saying is that the facts of this case were that an individual had been born in the United States, had left the country, and he not actually indicated any intention... And the issue really wasn't sufficient just to prove birthright citizenship, because the question was, was he a citizen at the time of entry? Because it was an exclusion case. We have a different case where it matters whether you're a citizen at the time of birth, effectively, because there's benefits that kick in right then that people are trying to get. That's correct. And I think that's the other reason that domicile was important, because this individual, Mr. Wong Kim Ark, had continued to be domiciled in the United States. He had left the country only briefly for a visit to visit family in China, and it wasn't the case that he had abandoned or taken an action that could be construed as having abandoned his citizenship to the United States. Do you know what the law at the time was about what sorts of acts would be sufficient to abandon citizenship? Was there any sort of clarity in the law on that point? I don't. I want to pretend that I'm an expert on the particular issue of expatriation under 19th century law, so I can't speak to that specifically, Your Honor. I do want to say that the defendant's domicile theory is not only squarely refuted by the reasoning and the ultimate holding of Wong Kim Ark, as we discussed, but it's contrary to subsequent Supreme Court case law, where the Supreme Court has repeatedly recognized children born to individuals who are here unlawfully or who are here on a temporary basis are nonetheless birthright citizens. Hintopolis, Errico, Rios Pineda, Hamdi, this court's own ruling, and Mariko V. Holder. And further, the domicile theory is contrary to the meaning of subject to the jurisdiction. So jurisdiction in the 19th century referred to the sovereign power to govern. We know that from contemporaneous dictionary definitions. We know that from Chief Justice Marshall's explication of jurisdiction in the Schooner Exchange. So a person was subject to the jurisdiction of the United States if the United States exercised complete governing authority over them. And we know it's complete. It had to be complete because that's what the floor debates tell us on the 14th. One argument that at least I was curious about. So the 14th Amendment's based on the Civil Rights Act of 1866, and that used subject to the foreign power, and then it became the jurisdiction that's in the 14th Amendment. So is there a change there? Do they mean something different? What is the relationship of those two formulations? So I think that Justice Gray addresses this in 1K Mark, and he makes clear that the subject to the foreign power should not be read as somehow broadening the scope of the exceptions under the Citizenship Clause or narrowing the right to birthright citizenship under the Citizenship Clause. And if there were any doubt in that regard, it was resolved by the more affirmative language subject to the jurisdiction. And some of that, is that... Do you read the ratification history or the run-up to it with the ratification history, but the run-up to the drafting of the 14th Amendment itself is the shift in language was in part because of an aversion to the Indians not taxed language, which seems to be related to its own debate about not distinguishing rich and poor, which is kind of to the side of all this, and that this language avoids the Indians not taxed. That's correct, Your Honor. There's quite a bit of... I mean, a central focus of the ratification debate is over the treatment of children born to tribal members. And so much of the shifts in the language were meant to clarify that the children of tribal members, rightly or wrongly, would not be entitled to birthright citizenship. And I think it's an important point because I know the defendant's site to Senator Trumbull's statements in the floor record, he actually makes this abundantly clear, and I think his statements squarely refute the defendant's argument, because on this issue of whether the children of Native Americans should be entitled to birthright citizenship or should be excluded from the scope of the clause, he says very clear what the meaning of subject to the jurisdiction was. He asks rhetorically, does the government of the United States pretend to take jurisdiction of murders and robberies and other crimes committed by one Indian upon another? Are they subject to our jurisdiction in any just sense? They are not subject to our jurisdiction. We do not exercise jurisdiction. It is only those persons who come completely within our jurisdiction who are subject to our laws that we think of making as citizens. That is a conclusive and definitive explanation from Senator Trumbull himself as to what subject to the jurisdiction meant. And it accords, of course, with Chief Justice Marshall's explication of jurisdiction in the Schooner Exchange. There's no doubt here that the United States exercises complete governing authority over non-domiciliaries, over the children of people who are here unlawfully or who are here temporarily. So the phrase subject to the jurisdiction was meant to capture only those few limited circumstances in which the United States does not exercise complete governing authority over some class of persons within the United States, either under the principles of international law, foreign diplomats or their families who are entitled to some measure of immunity or pursuant to treaty, Native American tribal members who have substantial tribal sovereignty, particularly with respect to internal affairs, or, of course, involuntarily, in the case of a hostile occupying force, a situation we've not had to confront since the War of 1812. Oh, go ahead. Can I ask you to address the standing issues? Before you do that, Judge Rucker, if you don't mind, just so we finish the merits, could you just address the statutory questions before we get to the standing? Sure, Your Honor. I think... Let me just ask this, because I guess with respect to the government's contention, imagine there's a lot of back and forth about the meaning of the Citizenship Clause, and we get different rulings. Now it means a little bit of this. Now this thing is resolved. Now that thing. Each of those changes as they occur might result in some deviation from the actual understanding that prevailed in 1940, which, let's posit, is fairly clear that it tracks an understanding of the old common law rule. I take it the government's position is, though, it just can't be that when you adopt something like that, just like RFRA, when you're trying to mimic a constitutional rule in your statute, that the framers of that statute should be understood to be insistent on their frozen conception of, at the time, rather than what the prevailing last word on the meaning of the constitutional term is. I guess that's the force of their argument, so that just practically speaking, wouldn't they want it to reflect whatever the constitutional rule is? Is there some reason to think that's wrong? Yeah, because I think the way to understand it is what was the intent when they... What was their understanding of the phrase subject to the jurisdiction, right? And their understanding of the phrase subject to the jurisdiction was informed by the holding of Wong Kim Ark. I'm just saying, they're making a threshold point, which is, that's true. Let's say they don't even dispute that. But since what they were trying to accomplish was to put in statute the meaning of the constitutional clause, wouldn't they have wanted it at all times to reflect whatever the Supreme Court's last word as to its meaning was? Why would we think otherwise? Otherwise, it's kind of each time the court changes its view, you got to read past the statute. And I think their view is, in a setting like this, wouldn't you say they're just adopting the constitutional understanding? And that doesn't hurt you in the least if Wong Kim Ark is what you say it is. But it is just an argument that if Wong Kim Ark isn't what you say it is, the statute can't be the reason why you win. Yeah, so I'm not aware of any case laws particularly on this point, the notion that when Congress uses a particular term of art that has a settled understanding and that settled understanding is informed by a prior case law, that if that case is subsequently overturned, that somehow that erases what Congress understood or what they intended to do when they use that phrase. Isn't the Sherman Act a little bit like that? Whatever the antitrust law of the moment is is what the Sherman Act codifies. We don't say, oh, it's what they thought antitrust law was in 1938. We just say it's the evolving view of the court as it finally adjudicates what the meaning of the Sherman Act is. Yeah, I mean, again, I won't pretend to be a Sherman Act scholar, but I think there's substantially broad language there and so that's just a matter of the courts continuing to interpret what that language means and the meaning of that language continuing to evolve. Meaning has to have had a fixed meaning in 1940 subject to the jurisdiction. That's correct, that's correct. And that fixed meaning was informed by the commission that President Roosevelt put together by Secretary Flournoy and the explanatory notes that were submitted to Congress that made very clear that what this means is it captures children of people even who are here temporarily. Standing. Can you just respond to the government's arguments that you, sorry for the two-part question, but that you forfeited any potential arguments in support of third-party standing and also that the order isn't enforced, won't be enforced against you and therefore you wouldn't benefit from the line of case law that says that you would have third-party standing in that circumstance? Yeah, so I don't think we forfeited this and this actually came up in the court's ruling on the stay pending appeal motion and so I think this issue has essentially been resolved already by this court. The government's argument in the court below I think from the district court to its argument that was made on the stay pending appeal motion materially evolved. I don't think it was clear that the argument they were making below was that there are prudential third-party standing limits that they're talking about. Their argument was framed entirely in terms of Article III standing before the district court and so the argument we made in response to that was essentially what are you talking about? When do you think the Kowalski line sort of came into this case? I'm sorry? When do you think the Kowalski sort of premise came into the case? I think the presentation of this as a prudential third-party standing limitation came up in the stay proceeding. I can't recall if it came up in the stay motion before the district court or if it was only by the time that it got to this court. By the time that it... So your position is actually they forfeited a challenge to prudential standing because that's waivable. Is that what you're saying? Yeah, I'm not taking the position that they forfeited. I'm simply making the point that we haven't forfeited anything. We were responding to the arguments that they presented in the district court. Either they raised it below or they didn't raise it below. So are you saying they didn't raise it below or that they did? I don't believe that they raised this argument that we are constrained based on prudential third-party standing limits. They did not challenge your prudential third-party standing. I think they made the argument that you do not have standing generally to pursue rights and interests that are not yours, and we said we are pursuing our own rights and interests because we have all of these pocketbook injuries and pocketbook harms. I see. So the idea would be as you understood it, it was part of their Article III claim. That's exactly correct. Then this sometimes happens, I guess this is your account, it became clear to you what they're really saying at which point you then made your response to it. That's correct. So that's not a forfeiture on their part or on their part. Everybody's preserved. To the extent that the argument was made below, we engaged with it on the terms on which it was made, and then as it was articulated as being an argument about prudential third-party standing limits and the stay motion, we engaged in it there. This court reviewed those issues and it resolved them squarely. I do want to address some of the factual points here about whether we are subject to the executive order and whether the executive order imposes duties or, as they argue in their brief, threatens sanctions against the states. I think the executive order absolutely imposes duties on us. What it says is the federal government will not recognize the citizenship of an entire class of people. Well, citizenship, this is just by direct operation of federal law. No further regulations are necessary. By direct operation of federal law, citizenship is a touchstone of eligibility for these benefits programs that the states are responsible for administering and operating. So we cannot simply ignore the fact that the federal government doesn't recognize the citizenship of these children. Just to put this in context, we have in the state of New Jersey more than 1,500 people who are dedicated to the task of verifying the eligibility of individuals in that state for purposes of Medicaid, CHIP, and other federally funded programs. We are bound by 42 U.S.C. 1320B-7 to verify eligibility consistent with the statute. The statute says you are eligible if you are a citizen or a qualified alien. These people are not, the children covered by the executive order as a direct consequence of the executive order are not citizens or qualified aliens. We have to respond to that by changing our eligibility verification systems and by no longer seeking to enroll these children in federally funded benefits. Are you challenging the order, the implementation of the order, or both? I think we're challenging both. Both? Yes. That's why we sought an injunction to enjoy an implementation of the order. But I think the order has, in a sense, a direct effect by operation of federal law. It doesn't require some other regulation. Even if it doesn't, each of the agencies will have that direct effect by taking the actions they're directed to take under the order, correct? That's correct. And I think the implementation plans that came out earlier this week are just confirmation of that. They're just the agencies recognizing what the law says. Can I ask one? Go ahead. But what you're really saying is that even putting aside the implementation, you are legally obligated to comply. So you will, the 1,500 people who are working on this on behalf of the state of New Jersey will immediately change what they are doing, and they won't submit requests for benefits for the people that fall under the order. Is that what you're saying? That's correct. And to tie this to the sanctions side of the equation, if we did that, we would be subject to monetary sanctions under 42 U.S.C. 1396C. Because we what? If we were to continue to simply enroll covered children, children under the executive order, in federally funded Medicaid and CHIP benefits, or submit reimbursement claims for foster assistance under Title IV-E. That's why you're citing COSERA. That's the analogy. That's like the COSERA case? That situation? That's the idea? Yeah, COSERA. There's the rock in a hard place kind of thing. But the basic idea is you can't just sit there once this order comes out, because you're at risk of losing your funding for the program. It is a necessary consequence and necessary function of the federal declaration that these children's citizenship will not be recognized by the federal government. I'm sorry. Just to make sure, sir, I understand, again, very practically. So if this order took effect, you would immediately comply with it, because obviously you don't want to be in violation of federal law, and you would not be submitting requests for federal benefits for the classes of people that fall under the order. That's what you're saying, right? We would not be able to do that. Our understanding is that that would be inconsistent with federal law. And I don't want to be technical, but it says they won't accept them. It doesn't tell you you have to do anything. I mean, you can submit things, and they're going to, I guess, not take them. But where's the part that says you must change something you're presently doing? They've taken obligation or put rules on themselves. We won't take certain things that we now view to be not worth what we thought they were. But what do you have to do? So that's 42 U.S.C. 1396C, which says that we are subject to penalties if we're not in compliance with our state plan. And we're not in compliance with our state plan if we submit claims for reimbursement for people who are not eligible under federal law. And I think if the record does suggest that this is exactly what we do, I'll point the court to the Joint Appendix 245 and 46. It refers to the documents that we submit in order to obtain reimbursements pursuant to Medicaid and CHIP. Can you just help me? I'm not saying that I'm not tracking what you're saying or that I think any of it's an inaccurate description. How does it fit with the test from Kowalski and Triplett that what has to happen is there has to be enforcement against the litigant? Well, I don't think that what Kowalski or Triplett or any of these other cases are saying is that the provision, like the literal... It says it has to be enforcement of the challenge restriction against the litigant. On your account, the challenge restriction is either the EO or the implementation of the EO or both, correct? It is the EO because the intersection between the EO and the background federal law subjects us to sanctions. But I don't dispute that there will be a problem depending on how you respond to it. I'm just asking, does this fit the model in Triplett and Kowalski where what has to happen is enforcement of the challenge restriction against the litigant and what are you calling the enforcement of the challenge restriction? I think what has to happen is one is... I'm just quoting Kowalski and Triplett. I think it's subject to enforcement pursuant to the challenge policy and we are subject to enforcement under 42 U.S.C. 1396C because the documents that we submit will be rejected and if we continue to enroll these children in Medicaid and we continue to submit reimbursement claims that purport to recognize their citizenship and purport to consider them as eligible for Medicaid or CHIP or other programs, those documents will be rejected and we will be out of compliance with our state plan. Was it right, I guess I just noticed this, that Section 1 says, the privilege of United States citizenship does not automatically extend to persons born in the United States and then sets out the two categories that it will not automatically extend to. I really hadn't picked up on that word automatically. So the question under Medicaid is ultimately whether they will be eligible. This has not been implemented. This hasn't been even, as I understand it, the Section 3 says, the government is supposed to figure out how it's actually going to do this, who's covered, who isn't. None of that has happened yet. So I understand everything you're saying, but is it really sort of right, in a sense, to know what's going to happen and how this is going to play out? Well, I think the agency implementation plans that were issued earlier this week make abundantly clear what's going to happen and what can only happen as a direct and necessary consequence of the EO that's been issued. I don't think there are any contingencies. What have those said? I guess I'm not as up to speed as I should be. In this past week, what have they said they're going to do? I apologize, Your Honor. We submitted a 28-J letter on this a couple of days ago, but HHS and CMS have confirmed that individuals covered by the executive order, consistent with, again, federal law and the eligibility rules, are not eligible for federal benefits. And they have also confirmed that various steps need to be taken to verify the eligibility. Those are steps that we need to take. These are the duties, to use counsel's words, that are imposed on us as a direct consequence of the executive order and as a consequence of the legal landscape in which the executive order lands. I don't think those background laws can be sort of disregarded because they are the things that make it, that give effect to what it means when the federal government says we're not going to recognize the citizenship of these children. There's a second point that I want to make, though, on third-party standing, which is that we don't think these prudential third-party standing limits should apply here at all because those limitations apply only when the party that brings the case lacks a sufficient connection to the interests recognized by the constitutional provision at issue. But here we clearly have a connection to the citizenship clause. It specifically mentions us by name and it binds our authority to define our citizenry and who is permitted to remain in our states. So this is cases akin to Bond v. United States where the Supreme Court found that both individuals and states have an interest in the Tenth Amendment. If there are no further questions on third-party standing, I want to just touch on... Just one, before we leave it, you were focused on the order itself having these effects as opposed to the implementation, but you said earlier that you were challenging both the implementation and the order. Is that wrong? I guess I'm not... In terms of the effects, I think the... I'm not clear on what the difference is between... Well, one thing is when they actually deny an eligibility request, that's more easily, to me, understood as an actual enforcement action. When we say we're not going to treat people as a citizen, it runs more, I think, into Judge Afrain's question about are we at the right point yet? I'm just asking that. But I guess in all of the cases that involve an enforcement exception, the law says you can't do X, right? And I think the executive order, read against the background law here, says you can't submit these claims. I don't think in any of those cases a challenger had to say an enforcement action was actually brought against me before they could challenge the law. No, in fact, most of them were pre-enforcement actions, correct? Exactly, exactly. But I guess just to follow this, the enforcement that you're describing, then, is the contemplated... What? The contemplated penalty against you if you continue to enroll them? It is... That is a sanction that is associated with enforcement. But it is... What flows directly from the EO is the rejection of any documents we submit seeking reimbursement on the premise that the children who we've enrolled are citizens. And the sanction that we are subject to if we continue to engage in the conduct that is prescribed by the EO is a monetary withholding of federal funds under 42 U.S.C. 1996. So I understand, simplified. If you keep going with your present policy, which I assume is, submit a birth certificate, it shows you were born in New Jersey, that's good enough for us, and you keep submitting those to the federal government, your position, to demonstrate Medicaid eligibility, they will withhold federal funds. Yeah, I just quibble with the premise as to how it works, because it's much more complicated. At 420, is that just basically what we're talking about? That is correct, Your Honor. Can I just ask one last question? How clear... Of course, do they have to withhold funds at that point under the statute? No, but of course... So does that... Maybe it doesn't, I just want you to answer it. Does the fact that they might have discretion as to whether to do that or not matter at all for our analysis of the third-party standing question? No, because all of the cases involving enforcement section involve statutes that, of course, the executive always retains non-enforcement discretion over. So I don't think that that's relevant to the question. I think it's being subject to enforcement. The Court's been quite generous with its time. I'm happy to touch briefly on the scope of relief issues or answer any questions about that. I just have one question about the... Just to make sure I understand it. With respect to the challenge where the State Department is the defendant, isn't the State Department a defendant here, or am I wrong? Yes, that's correct. Sorry, in this case. I take it there needs to be standing as to each defendant. That's a good question. I don't know that the issue has come up, but, yeah, I think that's probably fair to say. So is there anything in the record that suggests there would be standing as to the State Department? I think to the extent that the State Department has been charged with implementing the EO, that's why they were included and identified as a defendant. I think it is fair to say that the harms that we suffer, at least as we understand the process for implementation, are going to result from a range of activities that are taken by other agencies. I just can't rule out the possibility that there's not an interplay here, right? Because some of the actions taken by... That same for DHS, which is also... No, because I think some of the actions taken by USCIS, which is a component of DHS, are necessarily relevant here, and I think they're planned. So I don't want to rule out the possibility that there's an interplay in how this is implemented. Thank you. Anything further? Just on the scope of relief, as I understand, Judge Sorrell, can you just make sure I understand, the reason you need nationwide relief here is because to come up with a more nuanced procedure of people coming from other states to then figure out sort of the eligibility, which I acknowledge is more complicated than I made a second ago, would be very complicated and difficult and costly? Is that the prime point you're making as to why you need nationwide relief? That's exactly correct. The threshold point is that state-specific relief doesn't work because obviously we have children moving in from other states and then we have all the same losses of federal funds for reimbursement and all the same administrative challenges with having to come up with a new eligibility verification system. And as to the various alternatives that Judge Sorokin carefully considered, the record very clearly revealed that because of administrative complications, because of additional collateral burdens that would impose on the state, none of them could feasibly redress the plaintiff's injuries. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the Appalese DOE et al. please introduce himself on the record to begin? Good afternoon, Your Honors. Oren Selstrom on behalf of the DOE Appalese. I'd like to pick up on some of the points on the merits where my brother counsel left off and respond to several other points made by the federal government this afternoon. Birthright citizenship is so fundamental to the fabric of this country that it is expressly written into our Constitution. The government's argument, both in their briefing and here this afternoon, ignores both the history and the text of the Citizenship Clause. That clause was designed to repudiate the infamous Dred Scott decision and the dehumanizing institution of slavery and to repair a nation torn apart by civil war. It was placed under the 14th Amendment alongside the Equal Protection Clause to make clear that never again would the government be able to target a disfavored class and create a caste-like system by deciding which native-born children are entitled to citizenship. All who are born here, subject only to rare exceptions like the children of diplomats, are equal citizens in the eyes of the law. In construing the clause, as your honors have noted, all roads lead back to Wong Kim Ark. That momentous decision, followed by all three branches of government for over 125 years until the last six months, authoritatively rebuts all of the government's arguments. It makes clear that the 14th Amendment means what it says, that anyone born here who is fully governed by the legal authority of the United States is a citizen. That does not depend on parentage. It does not depend on subjective intent. It is automatic and attaches at the moment of birth. The government argues in their briefing that this interpretation, the same one that's been followed by all three branches of government over the last century, renders the qualifier subject to the jurisdiction superfluous because the government says everyone in the United States is subject to the country's full lawmaking power. But the answer is, not quite. As Wong Kim Ark explains in exhaustive detail, it is correct that virtually everyone born on American soil is subject to the laws of the United States, but not quite everyone. The government today characterized the many pages of Wong Kim Ark reviewing this history as just interesting historical background, but in fact it is key to the decision. At English common law, there were only a handful of very rare and very narrow exceptions to that principle, like the children of diplomats or invading armies. Wong Kim Ark holds that the framers of the 14th Amendment intended to and did incorporate that very broad birthright citizenship concept into our Constitution. In the words of the court, the qualifier, quote, was not meant to impose any new restrictions upon citizenship, but rather was meant only to, quote, exclude by the fewest and fittest words those accepted at common law. The government conceded this afternoon that under English common law, even the children of temporary visitors to the country were entitled to birthright citizenship. So they have to argue that the framers of the 14th Amendment deviated in some way from those longstanding principles. The problem for them is that Wong Kim Ark says exactly the reverse, and it doesn't just say it once or twice, that is the through line throughout the entire opinion, culminating in this holding on page 693. The foregoing considerations and authorities lead irresistibly to these conclusions. The 14th Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory. To argue otherwise, to claim that there are additional requirements for citizenship, the government has to resort to picking out snippets and phrases of Wong Kim Ark and stringing them together in ways that distort the holdings of that case. My brother counsel from the state has already reviewed how the government has done that as to domicile. They do it similarly when they talk about allegiance or a consent requirement that they want to add to the citizenship clause as a requirement. First of all, that's entirely atextual. There is nothing in the 14th Amendment that mentions consent or allegiance. It also totally disregards Wong Kim Ark. Allegiance is the just soli idea, isn't it? Allegiance is the common law idea. It just might not be what we today most commonly use the word, but it's an important word in understanding the common law rule, isn't it? Absolutely, and at common law, as I think your Honor is pointing out, it did not mean the subjective intent that we might think of as pledging allegiance to the flag, for example. It was something that accrued automatically upon birth within the king's dominion. So the Wong Kim Ark court talks about how protection and allegiance are two sides of the same coin, the protection that is owed when someone is born within the kingdom. Dominion just meant territory at the time, right? I mean, the word or the concept of dominion, it just meant the territory of the sovereign of the king. I thought the dominion is what brings in the exceptions, because you could be within the territory, but the dominion might not be coextensive completely with the territory because of an immunity for, say, an invading army or a foreign diplomat, or am I misunderstanding it? Territory in the sense of the geographic territory of the country, yes. And dominion, I thought, was something different than territory. Is that wrong? I thought that was the idea, was that you had dominion over aspects of the territory that might not be complete as to the territory. That's how you get the exceptions for the foreign ambassadors and the people on the foreign ships. Is that wrong? That's certainly correct as a matter of common law. That distinction that you're drawing between the physical territory of the nation versus dominion, meaning under the king's protection, essentially. But again, the key point is that it is automatic. It is not based on, it's consistent with your position.  Absolutely, and it does not depend on any kind of subjective intent, whether that is a domicile requirement, an allegiance requirement, a conflame requirement. The 14th Amendment includes the word subject to the jurisdiction rather than just in the territory. That's correct. And again, the lengthy and exhaustive detail that the court goes into in Wong Kim Ark is not just a historical background. It builds on itself. The court is saying over and over again, here's what the English common law was, something that attaches automatically subject to these very narrow, very well-defined exceptions. And that is what was brought over to the United States and the colonies, and then specifically saying that is what the framers intended to place into the Citizenship Clause and did. And Wong Kim Ark makes that point over and over again, especially at the passage that I cite. Just with respect to scope of release, unless anyone has further questions, this issue of what to do about unnamed or persons without specific declarations as to their standing. Is there a declaration saying that there are other people in the organization who also have the standing? Yes, there are. In the declaration they talk about how there is a large membership in both the Brazilian Workers Center and La Collaborativa, the two organizations, and how there are both the identified individuals who at that time were expecting, as well as people who were intending to grow families in the future. So it is in the record, yes. And the idea is that suffices to establish the standing of all those persons? Or is the idea that even if that's not there, it doesn't matter, because as long as there's a standing of identified person, then it just is the case that everybody in the organization who's like them also has made the standing sufficient to get an injunction on their behalf too? I'm just trying to figure out the theory. The standing, Your Honor, is for the organization. On behalf of whom? The standing is on behalf of their members. In order to share members with a member that has standing? No, on behalf of all of their members. And that is long-standing Supreme Court case law, long-standing case law from this court. We cited the Playboy Enterprises case in our briefing from this court that holds that it's the organization that gets standing, and the way to do that is an evidentiary matter. The way to prove that is to show a declaration that at least one member has standing. Does the relief then go only to those members that might be triggered by something that could happen here? I mean, you know, not everybody, you could be a member of the group, but none of the problem here pertains to you. So does the relief go to the organization or the subset of the organization that might be affected by the order? The relief does just what the district court says, which it goes to all of the members of the organization. Now, it may be that there may be some that it will not apply to, and that's, again, what this court said in Playboy Enterprises, happens and can happen in organizational standing cases, but there's no cases that the government has cited for this idea that it's only the identified members who can get relief. That's the whole point of associational standing, right, is you get to sue as an organization on behalf of your members as long as you can show with declarations that at least one of your members is directly impacted, and then because you are the plaintiff, the injunction covers the organization, correct? Isn't that the whole premise of associational standing? That is absolutely the entire premise of associational standing. The only ambiguity, and maybe it's not an ambiguity, the organization as such would not have standing here. It's not. It's self-injured. It's claiming the injury because there's a member who's injured. That enables it to have standing, and the question is for what and as to what, and I think the government's argument is, now you've shown you have standing when you otherwise wouldn't, so you can walk in and sue when this individual is denied their rights where otherwise you could not, but can you also do that as to another person in the organization for whom standing has never been shown? I think that's the question. What's the best case for that, Playboy Enterprises? From this circuit, Playboy Enterprises, which talks about although not every member may derive any immediate benefit from the injunction, no individual findings are necessary, and it can be reasonably supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. That is on point. That's from this court, but certainly all of the... Is there anything from the Supreme Court that... Absolutely. The International Union versus Brock, that's a case on associational standing that talks about how a union can bring a claim on behalf of their members worth versus seldom going back to the 1970s, talking about how organizations, quote, invoke the court's remedial powers on behalf of its members. In fact, this is the Hunt case from the Supreme Court. There are requirements if you're going to show organizational standing that the individual participation of members is not... Wait, there's organizational standing and associational standing, so I just want to make sure we're talking. This case is based on associational standing. Two different threads. Correct, as both Your Honors are pointing out, there is a branch of standing where the organization itself can be injured and assert standing on that basis or assert standing on behalf of their members. The latter is what we, or it's what the judge below, found that we are doing here and has ordered, as has always been the case in this type of case, ordered relief for all members. Obviously, I should probably preface this by saying this is an issue that has been waived. It was not raised at all in the court below. The first time that it was raised by the government was in their opening brief to this court. As this court has said as recently as March in the stay application in the state's case, where an issue was not raised below on a preliminary injunction, it is waived. So that issue is waived entirely. It also, the government happens to be incorrect on it as well. It's an abuse of discretion standard even if the court were to reach it. Clearly, the district court, by applying standing and organizational standing in the way that every other court has done over the years, cannot be an abuse of discretion on that measure. Thank you. Thank you, Your Honors. Thank you, Counsel. At this time, will Counsel for the Government please reintroduce himself on the record to begin? Eric McArthur. I just have three points. First, on the third-party standing issue and whether that was preserved below, it is absolutely incorrect that we did not make an argument based on the third-party standing doctrine below in our opposition to their motion for preliminary injunction, document number 92, beginning at page 18. We set out plaintiff's lax standing for two reasons. First was Article III, and second, the state plaintiff's lax third-party standing to assert citizenship clause claims on behalf of their residents, and then we had a page and a half on that point, too, raising the third-party standing argument. Their response, document 123, page 2, was finally defendants incorrectly argue that plaintiffs improperly advanced the rights of third parties under the citizenship clause. In fact, plaintiffs pressed their own interests in avoiding fiscal harm from an unlawful executive order. They never raised the argument that they fell within the exception where the challenge to action is enforced against the plaintiff leading to a violation of third person's rights. Second point, counsel for New Jersey talked about how they would have to redo all of their systems to verify compliance if the executive order were implemented. Judge Aprem, your question was spot on. Again, there's nothing in the executive order that requires them to do that. The executive order speaks only to federal officials. The states are free to continue to stand by their understanding of citizenship and implement this program consistent with that understanding. If the federal government then takes some adverse action and says, you're disbarred from Medicaid... What risk would they be taking? Well, that is the potential risk they could take is that they could be disqualified from... The question of potential risk is sort of what's lurking in all of these cases when they're pre-enforcement review, right? Well, but it's not right until that action is actually taken. It wasn't like a criminal prosecution occurred in June medical. It was the prospect of it. Well, I'm off of the third party standing issue. I'm now on to Article 3 standing and irreparable harm, whether they've shown any injury. They're pointing to all of these things that they're going to have to do to comply with the executive order's understanding of the citizenship clause. They don't have to comply with the executive order's understanding of the citizenship clause. If the federal government later moves against them because they served people who the federal government deemed ineligible or didn't adequately document citizenship in accordance with the executive order's understanding, that could tee up a dispute where this issue would be raised. That's not in this case. And then turning back to... Counsel, I'm sorry. Can you just clarify what you're arguing? If you're now making an Article 3 argument rather than a third party standing argument, you're saying they don't have to comply with the executive order but they're not going to get funding from the federal government, and that's their Article 3 injury that they're asserting. So I'm just having trouble following what you're arguing right now. So it's both Article 3 and irreparable harm. That may be correct. Let's suppose they provide services to someone who's not eligible for the federal program because they're not a citizen or qualified alien under the EO's definition of citizenship, and the federal government refuses to reimburse them for that. That can tee up a dispute that they can then take to court and say the federal government owes us this money because this person was a citizen contrary to the federal government's understanding. Everything at this point is too speculative in your mind to create Article 3 standing. We don't know what's going to happen. We're not in an immediate, you know, it's not an immediate harm that's coming like clapper, so you're just not there yet. It's too attenuated from the executive order itself. Any harms in this regard would flow from that subsequent agency action. Which hasn't happened. Which hasn't happened. May not, you say, so. How could that be that it wouldn't happen? That's the whole point of the EO. It says that the agencies shall not accept any of these documents that would allow the state to get that reimbursement. I thought you were. I'm assuming that it will happen. Okay, so it's not really speculative. Well, I think. You were then talking about irreparable harm, I thought. I think at the time this dispute, this case was filed, there was a great deal of speculation going on about how the executive order would be implemented. None of us knew because we were under an injunction that said we couldn't do any public guidance until. Counsel, I understand that the detail. I completely understand what you're saying with the details of implementation or, of course, unknown. But the executive order itself says very clearly in Section 2 that the federal agencies cannot accept any documents from the states that would support the citizenship of people in these classes, which means that the states won't get reimbursement. So are you arguing about speculative or not irreparable harm? The executive order says nothing about who is or is not eligible for federal benefits. HHS is going to have to make that determination. They've now put out some public guidance that I think indicates that some of these people ultimately may be eligible for benefits and others not. But let me give you a very good example of, and this is in our 28-J response. The plaintiffs, when they filed this lawsuit, said all sorts of things about how if the executive order is implemented on the Social Security side, we are going to have to revamp all of our systems to provide all of this additional documentation about parent citizenship or immigration status in order for a Social Security number to issue. That was pure speculation, and the Social Security Administration, within the last week or 10 days, has now finally issued guidance, and it shows that that is just not true. Let's put aside the compliance, just on a simple point. Are you saying that it is possible now, I guess, or pre-guidance at least, and so it was possible at the time they filed the complaint, that every single person who would be within the executive order and therefore not a citizen would nonetheless be eligible under every program so no one would lose any benefits? Is that a possible understanding? Is it speculative to think otherwise? I don't know if that's a possible understanding. Would you think it would be speculative to think that some people were not going to get their benefits? I think it is contingent on how it gets implemented by the agency. Is one possibility within the realm of reason that everybody would get the benefits? I think that is at least conceivable. In some respects, that depends on the immigration status of these children. They haven't plausibly alleged that they would suffer pocketbook injury because it is possible that under this EO, everybody would get the benefits just as before. It is not so much pocketbook injury as is it traceable to the EO itself or to the subsequent agency action that actually implements us and tells us concretely here is who will and won't be eligible under the executive order for the receipt of federal benefits. All of this, I think, is also a self-inflicted harm arising from their decision to provide benefits to people who don't qualify for the federal program. The final point that I wanted to make, turning back to the merits, going back to Longkin Mark, pages 693 to page 694. It's a much longer opinion than it needed to be. It is a very long opinion, but I do think that pages 693 and 694 are key to understanding the scope of the courseholding and the applicable rule that it discerned from all of that previous discussion. I have yet to hear an account of why they built that domicile limitation into those two key sentences that state they're holding if what they really meant to say is everyone present here. It's not just on 693, it's also on page 694 where the course says, Chinese persons born out of the United States, we're talking about Long's parents here, born out of the United States are entitled to the protection and allegiance to the United States so long as they are permitted by the United States to reside here. On their understanding, Longkin Mark there should have said so long as they are present here. The plaintiffs have pointed to the sentence. Definitely shouldn't have said we adopt the ancient form of citizenship for purposes of the 14th Amendment. I think you have to square what they said there with what they said immediately next where they included that domicile limitation one final point, and I do think this is important. This is the point the Ninth Circuit got wrong, that plaintiffs are getting wrong as well. It's the bottom of that page where there's a sentence that talks about independently of a residence or independent of any domiciliation. They are misconstruing that sentence. What that sentence is saying, it's making an a fortiori point. It is saying that it can hardly be doubted that a domiciled alien is completely subject to the political jurisdiction of the country given that even those who are here only temporarily have a duty to obey U.S. law. It is not saying that domicile is irrelevant to the analysis which would be impossible to square with the express domicile limitations the court built in. Thank you, counsel. That concludes argument in this case.